# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| RITA BALACHANDER, Individually and as | § | |
| Representative of the Estate of VERN | § | |
| BALACHANDER, Deceased; and ADITYA | § | |
| BALACHANDER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-4805 |
| | § | |
| AET INC. LIMITED, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

The issue presented in this motion to remand is the location of AET Incorporated ("AET")'s principal place of business. If AET's principal place of business is its Houston office, as the plaintiffs contend, remand to the Texas state court where this wrongful-death suit was filed is required. If AET's principal place of business is in Kuala Lumpur, Malaysia, as AET contends, complete diversity exists. In *Hertz Corporation v. Friend*, the Supreme Court held that "the phrase 'principal place of business' [in 28 U.S.C. § 1332(c)(1)] refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." 130 S. Ct. 1181, 1186 (2010). Applying this test to the evidence submitted by the parties, this court concludes that AET has met its burden of showing that its principal place of business under § 1332(c)(1) is Kuala Lumpur, Malaysia, because that is where its president and chief executive officer and its vice president and chief financial officer live and work to direct, control, and coordinate AET's activities. The motion to remand is therefore denied. The reasons for this ruling are explained below.

## I.      Background

Vern Balachander worked as a marine surveyor for Bureau Veritas, a ship-classification society. AET contracted with Bureau Veritas to inspect an AET-owned foreign-flagged commercial vessel, the *M.V. Eagle Anaheim*, while that vessel was in foreign waters. Balanchander died while inspecting the vessel's tanks. The plaintiffs are his widow and sons. They sued an AET in Texas state court, asserting negligence under general maritime law and Texas law. AET timely removed based on diversity of citizenship. (Docket Entry No. 1). The plaintiffs moved to remand the case for lack of subject-matter jurisdiction, (Docket Entry No. 5); AET responded, (Docket Entry No. 6). After discovery targeted to the issue of AET's principal place of business, the plaintiffs replied, (Docket Entry No. 14), and AET surreplied, (Docket Entry No. 17). This court held oral argument on the remand motion. (Docket Entry No. 24). Based on the record; the motion, response, reply, and surreply; the arguments of counsel; and the relevant law, this court denies the motion to remand.[1]

---

[1]The parties have submitted the following evidence on the issue of AET's principal place of business:
- The Balachanders' original state-court petition, (Docket Entry No. 5, Ex. A);
- AET's notice of removal, (*id.*, Ex. B);
- AET's 2005 Texas Franchise-Tax Public-Information Report, (*id.*, Ex. C);
- AET's Amendment to Corporate Registration with the Texas Secretary of State, (*id.*, Ex. D);
- AET's March 9, 2006 Assumed Name Certificate with the Texas Secretary of State, (*id.*, Ex. E);
- AET's 2007 Texas Franchise-Tax Public-Information Report, (*id.*, Ex. F);
- AET's 2010 Texas Franchise-Tax Public-Information Report, (*id.*, Ex. G);
- Excerpts from AET's 2007 Corporate Report, (*id.*, Ex. H);
- Excerpts from AET's 2010 Corporate Report, (*id.*, Ex. I);
- Affidavit of Mohd Arip bin Ismail, (*id.*, Ex. J);
- Affidavit of Nicholas Fell, (Docket Entry No. 6, Ex. A);
- AET's Corporate Certificate, (*id.*, Ex. B);
- Excerpts from AET's 2010 Corporate Report, (*id.*, Ex. C);
- The Balachanders' original state-court petition, (*id.*, Ex. D);
- Excerpts from deposition of Margo Terrell, (Docket Entry No. 14, Ex. A);
- April 5, 2011 AET-Houston's corporate-organization chart, (*id.*, Ex. B);
- AET's 2010 Texas Franchise-Tax Public-Information Report, (*id.*, Ex. C);
- AET's answer and crossclaim in *Williams v. Suisse-Atlantique Soc'y de Navigation Maritime S.A.*, (*id.*, Ex. D);
- Excerpts from AET's 2010 Corporate Report, (*id.*, Ex. E);
- The Balachanders' deposition notice, (Docket Entry No. 17, Ex. E);
- AET's objections to that notice, (*id.*, Ex. F);

AET Incorporated, which has its office in Houston, is part of the AET group of companies. This group is the "global owner-operator of a fleet of petroleum vessels." (Docket Entry No. 6, ¶ 13; *see also id.*, Ex. A, ¶ 4). AET's brief and supporting evidence describe the overall corporate structure as a "number of wholly-owned subsidiaries governed by the group holding company AET Tanker Holdings Snd Bhd, which is a company registered in Malaysia." (*Id.*, ¶ 13; *see also id.*, Ex. A, ¶ 4). The corporate-organization charts show that in addition to the headquarters in Kuala Lumpur, there are four regional commercial-operation centers located in Houston, London, Singapore, and Guragon, India; ship-management centers located in Singapore and Kuala Lumpur; and offices for "crewing and manning" vessels located in India and the Phillipines. (*Id.*, ¶ 13; *see also id.*, Ex. A, ¶ 4). It is undisputed that the only defendant in this case, AET, is incorporated in Bermuda and has its only office in Houston.

AET is wholly owned by AET Holdings [L] Pte. Ltd., which is in turn wholly owned by AET Tanker Holdings Sdn Bhd. AET Holdings and AET Tanker Holdings are registered in Malaysia, where they maintain their primary offices. (*Id.*, ¶ 10; *see also id.*, Ex. A, ¶ 4). AET Tanker Holdings is wholly owned by MISC Bhd, a Malaysian energy company. (*Id.*, Ex. C).

AET's principal business is owning Singapore-flagged and other foreign-flagged vessels. The vessels are deployed globally. (*Id.*, ¶ 14; *see also id.*, Ex. A, ¶¶ 5–6). According to AET, "The overall policies, business strategies, business plans, and business guidelines for the conduct of

- Amendment sheet for Margo Terrell's deposition, (*id.*, Ex. G);
- Court reporter's May 16, 2011 letter setting deadline for making any changes to Terrell's deposition, (*id.*, Ex. H);
- Affidavit of Robert T. Miller, (*id.*, Ex. I);
- Complaint filed in *Williams v. Suisse-Atlantique Soc'y de Navigation Maritime S.A.*, (*id.*, Ex. J);
- Excerpts from AET's 2009 U.S. tax return, (*id.*, Ex. K);
- AET's objections and answers to interrogatories, (*id.*, Ex. L); and
- Affidavit of Christina K. Schovajsa, (*id.*, Ex. L).

3

[AET]'s business are decided and established by its Chief Executive Officer and Chief Financial Officer, both of whom reside and office in Kuala Lumpur, Malaysia, the Senior Management Team of the AET Group, and the board of AET Tanker Holdings Sdn Bhd." (*Id.*, ¶ 14).  Hor Weng Yew is AET's President and Chief Executive Officer.  Izwan Ismail is AET's Vice-President and Chief Financial Officer.  They are paid by AET Tanker Holdings, not AET.  (Docket Entry No. 17, Ex. L).  AET's other officers are Ernest Morrison, who works in Bermuda; Patricia Dean, who works in Bermuda; Nicholas Fell, who works in London; and Coson Corporate Services, a company in Bermuda.  (*Id.*).  AET's directors are Weng Yew, who lives and works in Kuala Lumpur; Ismail, who lives in works in Kuala Lumpur; and Fell, who lives and works in London.  (*Id.*).

The CEO and CFO set AET's annual budgets, subject to the approval of AET Tanker Holdings's board.  Assets and profits of AET are considered part of the assets and profits of AET Tanker Holdings.  Assets and profits are reported according to regional sector rather than by subsidiary.  (*Id.*, Ex. C; Docket Entry No. 14, Ex. A, at 59–60).  Payments to AET for charter contracts entered into by AET in Houston are sent directly to a Citibank account in Hong Kong or New York and are designated for payment to AET.  (Docket Entry No. 17, Ex. I).  If collection from those contracts is an issue, the "post-fixture department in Houston" would handle the collection work.  (*Id.*, ¶ 8; *see also id.*, Ex. G).

Almost all of AET's 56 employees work in its Houston office.  (Docket Entry No. 17, Ex. L).  The Houston office's highest-ranking employee is Peter Liew, who serves as the senior manager of AET and also fulfills a leadership role for the AET Group.  (Docket Entry No. 6, Ex. A, ¶ 11; Docket Entry No. 14, Ex. A, at 36–37).  He works out of Houston and communicates several times a week with Hor Weng Yew.  (Docket Entry No. 14, Ex. A, at 40–44).  AET's primary business

4

activities are managing commercial operations, which includes chartering vessels in the Atlantic and dealing with clients for those operations, as an agent for AET Holdings.  Maintenance of the vessels is handled by Shipmanagement (Singapore) Pte, not AET.  (*Id.*, at 44–48; *see also* Docket Entry No. 17, at 5–6).

The evidence shows that AET employees in Houston have authority to make certain decisions for the company, within limits.  Liew, whose official title is commercial director for Aframax Atlantic and whose responsibilities extend over AET's Houston employees and AET UK Limited's London employees, is located in Houston.  Liew can enter contracts that bind AET for as long as one year without approval from Weng Yew.  Any contract that binds AET for more than one year requires approval from Weng Yew in Malaysia.  In practice, Liew regularly seeks approval from Weng Yew before entering contracts within his authority.  (Docket Entry No. 14, Ex. A, at 50–52).  Liew and other Houston AET employees had to obtain authority and approval from Weng Yew to negotiate a new rental for the lease for the Houston office.  Liew and other Houston AET employees cannot hire an employee in the position of Associate Vice-President or above without authority and approval from Weng Yew.  (*Id.*, at 44, 93–95).  "No one at the AET Inc. Limited office in Houston has the authority to make decisions regarding the purchase or sale of the vessels owned by AET Inc. Limited."  (Docket Entry No. 6, Ex. A, ¶ 8).  These decisions are made by Weng Yew and Ismail in Kuala Lumpur, after conferring with the most senior member of the Houston office.  (*Id.*; *see also* Docket Entry No. 14, Ex. A, at 90–91).  No ownership records are kept in the Houston office.  (Docket Entry No. 14. Ex. A, at 62).

AET retains a "senior financial person" in Houston who is "responsible for the closing and the day-to-day financial operations in Houston."  (*Id.*, at 61).  Long-term financial operations are

5

managed by the AET Group and Weng Yew.  The heads of the Houston departments of human resources, ship management, finance, and legal, report to the AET Group or AET Tanker Holdings of their department through regular phone calls and interoffice phone systems.  (*Id.* at 112–128). Many of these group leaders are stationed in Singapore and Kuala Lumpur and are ultimately under the direction of Weng Yew.  (Docket Entry No. 6, Ex. C).

AET has filed Texas Franchise Tax Public Information Reports with the Texas State Comptroller, including a report dated February 22, 2010, in which it lists  its mailing address and the addresses of its directors in Houston.  (Docket Entry No. 5, Exs. C, F, G).[2]  AET Tanker Holdings, on the other hand, states in a corporate report entitled "Impressions of AET" that the Houston subsidiary is a branch office and one of "a series of global units."  (Docket Entry No. 6, Ex. C, at 10).

AET also filed an affidavit by Mohd Arip bin Ismail in January 2010 in connection with a limitation proceeding in the Eastern District of Texas.  In that affidavit, bin Ismail stated that AET's office is located in Houston.  (Docket Entry No. 5, Ex. J, ¶ 1).

In this dispute, AET argues that it is a citizen of Malaysia, where its CEO and CFO direct the company.  (Docket Entry Nos. 6, 17).  The plaintiffs, relying primarily on the evidence that AET has a large number of employees and its only office in Houston; that in franchise-tax report filings with the Texas State Comptroller, AET stated that its "principal office" or "principal place of business" was located in Houston; and that the answer filed in the Eastern District of Louisiana limitation proceeding identifies AET as "a foreign legal entity with its principal place of business

---

[2]The 2010 Franchise Tax Public Information Report lists Houston addresses for AET's CEO and CFO.  (Docket Entry No. 5, Ex. G).  The plaintiffs concede that this statement is a mistake and that these individuals work and live in Kuala Lumpur.  (Docket Entry No. 14, at 6).

in Houston," argues that AET's principal place of business is in Houston.  (Docket Entry Nos. 5, 14).  The plaintiffs argue that AET is improperly relying on the "nerve center of its parent and affiliated companies."  (Docket Entry No. 14, at 8).  AET responds that under the bright-line test established in 2010 in *Hertz*, they have met their burden of showing that AET's nerve center is not Houston but rather Kuala Lumpur, where its President and CEO, Vice-President and CFO, and its most senior executives work on a day-to-day basis and from where they exercise overall direction, control, and coordination of AET's business activities.  (Docket Entry No. 6, ¶ 27).

The arguments, evidence, and legal standard are analyzed below.

## II.     The Applicable Legal Standards

### A.     Removal

A defendant has the right to remove a case to federal court when federal subject-matter jurisdiction exists and the removal procedure is properly followed.  *See* 28 U.S.C. § 1441.  The removing party bears the burden of showing that federal jurisdiction exists and that removal is proper.  *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (citing *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995)).  In a removed action, a district court is required to remand the case to state court before final judgment if it determines that it lacks subject-matter jurisdiction. *See* 28 U.S.C. § 1447(c); *McDonal v. Abbott Labs.*, 408 F.3d 177, 182–83 (5th Cir. 2005).  The existence of federal subject-matter jurisdiction is determined at the time of removal from state court.  *See In re Bissonet Invs. LLC*, 320 F.3d 520, 525 (5th Cir. 2003) (citing *Arnold v. Garlock*, 278 F.3d 426, 434 (5th Cir. 2002)); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264 (5th Cir. 1995).  A court may determine whether subject-matter jurisdiction exists based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the

record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Spotts v. United States*, 613 F.3d 559, 565–66 (5th Cir. 2010) (quoting *St. Tammany Parish ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009)). "When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof." *Hertz Corp.*, 130 S. Ct. at 1194–95.  Removal statutes are construed strictly in favor of remand.  *Manguno*, 276 F.3d at 723.   The removing party "bears the burden of establishing federal jurisdiction by a preponderance of the evidence." *In re Perempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010); *see also Manguno*, 276 F.3d at 723.

### B.      Principal Place of Business under 28 U.S.C. § 1332(c)(1)

AET removed based on diversity jurisdiction.  Federal courts have diversity jurisdiction over a case when the parties are completely diverse and the amount in controversy exceeds $75,000 in controversy, exclusive of interest and costs.  28 U.S.C. § 1332; *Breaux v. Dilsaver*, 254 F.3d 533, 536 (5th Cir. 2001).  The primary purpose of diversity jurisdiction is to allow out-of-state defendants to avoid local prejudice by having their cases heard in federal court.  *Hertz*, 130 S. Ct. at 1188. Under 28 U.S.C. § 1332, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  The parties agree that the plaintiffs are Texas citizens, that AET is incorporated in Bermuda, and that the amount in controversy exceeds $75,000.  The issue for diversity jurisdiction is whether AET's principal place of business is in Houston.  If so, this court lacks subject-matter jurisdiction.

Section 1332 does not define "principal place of business," making the phrase "more difficult to apply than its originators likely expected."  *Hertz*, 130 S. Ct. at 1190.   Courts originally

developed two models to determine a corporation's principal place of business.  *Id.* at 1190–92.  The nerve-center test, applied where a corporation's activities were "far-flung," focuses on the location from where the corporation's "officers direct, control and coordinate all activities."  *Id.* at 1191 (quoting *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862, 865 (S.D.N.Y. 1959)).  Where a corporation's activities were more focused, courts used the business-activity test.  This test looked to "where a corporation's actual business activities are located."  *Id.*   Many courts, including the Fifth Circuit, blended the two into a "total activities" test.  *See, e.g.*, *J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401, 407–12 (5th Cir. 1987) (concluding that "neither the 'nerve center' nor the 'place of activity' test inflexibly dictates the corporation's principal place of business").  This approach required courts to "fully examine the corporation's operations and its nerve center in the context of the organization of that business."  *Id.* at 411; *see also Toms v. Country Quality Meats, Inc.*, 610 F.2d 313, 315 (5th Cir. 1980) ("The 'total activity' test is not an equation that can provide a simple answer to the question of a corporation's principal place of business. Each case necessarily involves somewhat subjective analysis."  (internal citation omitted)).  Courts across the country considered an increasingly diverse set of factors, leading to "growing complexity" that was "at war with administrative simplicity."  *Hertz*, 130 S. Ct. at 1191–92.

The Supreme Court sought to end this confusion in *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010).  The corporate defendant's largest center of operations was in California, but its senior officers were located in New Jersey.  *Id.* at 1186.  The issue was what test to apply.  The Court adopted the nerve-center test, defining "principal place of business" as the place where "a corporation's officers direct, control, and coordinate the corporation's activities."  *Id.* at 1192.  It explained that the nerve center "should normally be the place where the corporation maintains its

9

headquarters—provided that the headquarters is the actual center of direction, control, and coordination." *Id.* The Court cautioned that courts should not be bound by formalities, because doing so would allow jurisdictional manipulation. Under the nerve-center analysis, if a court finds an attempt to manipulate diversity jurisdiction, such as labeling a "bare office with a computer" as the "headquarters" or "nerve center," for example, then the court "should instead take as the 'nerve center' the place of actual direction, control, and coordination in the absence of such manipulation." *Id.* at 1195. If the headquarters was simply "the office where the corporation holds its board meetings," that headquarters would not be the principal place of business. *Id.* at 1192. A corporation's description of a location as its headquarters should not, without more, settle the issue. *Id.* at 1195 (considering an S.E.C. filing).

The *Hertz* Court recognized that "hard cases" would remain. *Id.* at 1194. It highlighted the challenges posed by "this era of telecommuting, [in which] some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet." *Id.* The Court emphasized that the nerve-center test "points courts in a single direction, towards the center of overall direction, control, and coordination. Courts do not have to try to weigh corporate functions, assets, or revenues different in kind, one from the other." *Id.*[3]

---

[3] The *Hertz* Court emphasized that in deciding the principal place of business, a simple and bright-line rule was important:

> Complex tests produce appeals and reversals, encourage gamesmanship, and again, diminish the likelihood that results and settlements will reflect a claims legal and factual merits. Judicial resources too are at stake. Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it. So courts benefit from straightforward rules under which they can readily assure themselves of their power to hear a case.

130 S. Ct. at 1193 (internal citations omitted).

In *Central West Virginia Energy Company v. Mountain State Carbon, LLC*, 636 F.3d 101 (4th Cir. 2011), one of the few appellate cases applying *Hertz*, the court held that the defendant-corporation's principal place of business for diversity purposes was not where the corporation's day-to-day management activities took place, but rather where the corporation's high-level officers directed, controlled, and coordinated its activities. *Id.* at 107. Central West Virginia Energy, a West Virginia company, sued Mountain State Carbon and one of its member companies, Severstal Wheeling, in federal court. Mountain State and Severstal Wheeling moved to dismiss, asserting that Severstal Wheeling's principal place of business was in West Virginia. Because Central Energy was a West Virginia citizen, Mountain State and Severstal Wheeling argued that diversity jurisdiction did not exist. Citing *Hertz*, the district court granted Mountain State's motion and dismissed the complaint for lack of subject-matter jurisdiction. *Id.* at 103. Central West appealed, arguing that the district court erred in its application of *Hertz* when it determined that Severstal Wheeling's principal place of business was West Virginia, despite the fact that Severstal Wheeling's officers controlled the company's policies and high-level decisions from Michigan. The Fourth Circuit agreed with Central Energy. The record showed that Severstal Wheeling's officers directed, controlled, and coordinated the corporation's activities from Dearborn, Michigan, where seven of Severstal Wheeling's eight corporate officers—including its chief executive officer, chief operating officer, chief financial officer, and general counsel and secretary—maintained their offices. Only the eighth corporate officer, a vice president and general manager, maintained his office in Wheeling, West Virginia. None of Severstal Wheeling's five directors was located in West Virginia. *Id.* at 104–05. Severstal Wheeling showed that its "day-to-day operations," including purchasing

materials, selling products, managing environmental compliance, and administering human-resources matters such as payroll, were conducted in Wheeling, but the court found that this was not relevant to the nerve-center test under *Hertz*. *Id.* at 105–06.  The fact that the high-level officers directed, controlled, and coordinated the business activities in Michigan meant that the nerve center, and therefore the principal place of business, was in Michigan.  *See id.* at 107.

The court also rejected the argument that the defendants were attempting to rely on Severstal Wheeling's parent company's principal place of business.  The court found it irrelevant that Severstal Wheeling's officers in Dearborn worked from a building owned by the parent company and were also involved in affiliated companies' business activities. The court refused "any invitation to examine, for example, how much time Severstal Wheeling's officers devote to directing Severstal Wheeling's versus affiliated companies' business. Doing so would subvert the Supreme Court's guiding principle in *Hertz*—establishing a simple jurisdictional rule to avoid resource-intensive litigation." *Id.* at 107 (citing *Hertz*, 130 S. Ct. at 1193).

Like the Fourth Circuit, several district courts post-*Hertz* have analyzed a defendant-corporation's citizenship on the basis of where its high-level officers direct, control, and coordinate the corporation's activities.  *See, e.g.*, *Vision Bank v. Dynamic Air, Inc.*, No. 10-00543-CG-B, 2011 WL 1475939, at *5–6 (S.D. Ala. Mar. 30, 2011); *Brewer v. SmithKline Beacham Corp.*, 774 F. Supp. 2d 720, 728–30 (E.D. Pa. 2011); *Health Facilities of Cal. Mut. Ins. Co. v. British Am. Ins. Grp., Ltd.*, No. CV 10-3736 PSG (JCGx), 2011 WL 97965, at *3–4 (C.D. Cal. Jan. 11, 2011).  These precedents are applied to the record before this court.

## III.    Analysis

This case is an example of the complexity that can arise from complex and far-flung corporate structures. Such complexities led the *Hertz* Court to reject a nuanced and fact-specific test in favor of a bright-line test. AET's senior officers are spread across multiple locations. The only AET office is in Houston. AET has made statements that its "principal place of business" or "principal office" is in Houston, for purposes and in contexts other than diversity jurisdiction. But a close examination of the record shows that AET's nerve center—the place where its officers direct the corporation's business activities—is Kuala Lumpur, Malaysia. The evidence on which AET relies directly addresses where the senior decisionmakers direct the corporation. The plaintiffs point to evidence that does not directly address the dispositive issue under the nerve-center test.

The record demonstrates that AET's CEO and CFO direct AET from Kuala Lumpur, Malaysia. The CEO and CFO are the most important AET decisionmakers. (*See, e.g.*, Docket Entry No. 14, Ex. A, at 77 ("We're not denying that we conduct business in Texas, but the decision making related to that business all comes from the senior officers located in Kuala Lumpur.")); *see also Health Facilities of Cal.*, 2011 WL 97695, at *2–3 (identifying a corporation's principal place of business as the place where its President and Director worked, even though several officers worked elsewhere). The CEO and CFO set AET's budget. The evidence showed that although Houston employees had some authority to enter into contracts that bind the company for up to a year, and to hire and fire employees below the level of senior vice-president, decisions that set the corporation's policies and direction are made in Kuala Lumpur. The CEO, Hor Weng Yew, must approve purchases and sales of ships and ship leases lasting more than a year. In practice, he is involved in deciding whether to enter into other contracts as well. Weng Yew must approve hiring and firing decisions of all AET employees at the senior-vice-president level and higher. The fact

13

that high-ranking members of the Houston office regularly turn to Weng Yew for approval and must do so for high-level hiring decisions and significant contracts points to a single location in Kuala Lumpur as the "corporate brain" of AET.  *Hertz*, 130 S. Ct. at 1193; *see also Toms*, 610 F.2d at 316 (looking to where "major business policy decisions" were made); *Astra Oil Trading NV v. Petrobas Am. Inc.*, No. H-09-1274, 2010 WL 3069793, at *5 (S.D. Tex. Aug. 4, 2010) (the individual CEO was the "recognized corporate leader").  Although in *Central West Virginia*, a larger number of high-ranking officers and directors worked in the nerve-center location than is true of AET officers and directors working in Kuala Lumpur, there, one high-ranking officer did work in the "operations" center, while here, no high-ranking officer or director of AET works in Houston.

The plaintiffs rely heavily on various AET documents.  The plaintiffs point to AET Group's 2007 corporate report, which states that "AET Inc Limited operates mainly from Houston and is responsible for our U.S. Gulf, Mexican, and Caribbean operations."  (Docket Entry No. 5, Ex. H(b), at 1).  The report also identifies the corporate office's location in Houston and states that the company "employs our Houston-based personnel."  (Docket Entry No. 5, Ex. I, at 36).  The report's statements are consistent with finding that AET's principal place of business is in Malaysia.  Whether AET "operates primarily from Houston" is not relevant to the question at issue: where do the company's high-ranking decisionmakers work, set corporate policy, and direct the corporation's business activities.  *Hertz*, 130 S. Ct. at 1194 (explaining that the nerve center lies not where "the bulk of a company's business activities visible to the public take place," but where "its top officers direct those activities").

The plaintiffs also rely on AET's statement in a 2009 answer and crossclaim in a federal court in Louisiana that it is a "foreign legal entity with its principal place of business in Houston,

14

Texas." (Docket Entry No. 14, Ex. D, at 6). The plaintiffs do not contend that this statement subjects AET to judicial estoppel. AET points out that jurisdiction in that case arose under admiralty jurisdiction, not diversity jurisdiction under § 1332(c)(1). (Docket Entry No. 17, Ex. J, ¶ 3). *Hertz* made it clear that its formulation of the nerve-center test was the exclusive test for determining where a corporation's principal place of business was located for the purpose of § 1332(c)(1). *Hertz* did not define the meaning of the phrase "principal place of business" for any other purpose. And to the extent that the Louisiana pleading could be understood as a statement that AET's § 1332 principal place of business is in Houston, this and other pre-*Hertz* statements should be viewed with care. A company's pre-*Hertz* principal place of business may not be its principal place of business post-*Hertz*. Although it is appropriate to consider such statements, the Court made clear in *Hertz* that a corporation cannot establish its principal place of business simply by the "filing of a form . . . listing a corporation's 'principal executive offices'" because, if the rule were otherwise, parties could engage in "jurisdictional manipulation." 130 S. Ct. at 1195. The affidavit filed in the Eastern District of Louisiana suit does not support finding that AET's principal place of business is Houston under *Hertz*.

Nor does the company's 2005, 2007, and 2010 Texas Franchise Tax Public Information Reports listing Houston as its "principal place of business" support the conclusion that AET's principal place of business under § 1332(c)(1) is in Houston. (Docket Entry No. 5, Exs. C, F, G). The Supreme Court specifically warned against relying too heavily corporate filings. The *Hertz* Court considered a Form 10-K filed with the S.E.C. The document listed the corporation's "principal executive office." *Hertz*, 130 S. Ct. at 1195. The *Hertz* Court noted that the definition of "principal executive office" differed from the nerve-center test under § 1332(c)(1). *Id.* (citing

15

*Dimmitt & Owens Fin., Inc. v. United States*, 787 F.2d 1186, 1190–92 (7th Cir. 1986)).  The Court also noted that relying on such filings too heavily would create opportunities for jurisdictional manipulation, which Congress had sought to avoid by amending § 1332 to make a corporation a citizen of the state where its principal place of business was located as well as where it is incorporated.  *Id.*

The Texas Tax Code requires each corporation to disclose its "principal place of business" in a filing made available to the public.  TEX. TAX. CODE § 171.203(5).  Section 171.203, however, does not define "principal place of business."  And the plaintiffs have identified no authority suggesting that the definition is the same as under § 1332(c)(1).  In at least one context, personal-property taxation, the Texas Court of Appeals rejected the proposition that a corporation's "principal place of business" is not the corporation's nerve center but the primary office located in Texas.  *See Melton Truck Lines, Inc. v. Gregg Cnty. Appraisal Dist.*, 864 S.W.2d 137, 139 (Tex. App.—Texarkana, 1993, no writ).

The corporate-registration statements are unpersuasive for essentially the same reasons.  AET stated in its corporate-registration statement that its "principal office" was in Houston.  (Docket Entry No. 5, Ex. E).  But there is no basis to conclude that the "principal office" is the nerve center under *Hertz*.  Two Texas statutes refer to venue as proper in the county of the defendant's "principal office *in this state*."  TEX. CIV. PRAC. & REM. CODE §§ 15.018(b)(2), 15.0181(c)(1), 15.0181(d)(2), 15.0181(e)(1) (emphasis added); *see also In re Mo.Pac. R.R. Co.*, 998 S.W.2d 212, 220 (Tex. 1999) (holding that, unlike *Hertz*'s test for the nerve center, "a company may have more than one principal office" under Texas law).  None of these documents speaks to where the "actual direction, control, and coordination" takes place.  *Hertz*, 130 S. Ct. at 1195.

The plaintiffs' reliance on *Petro Star, Inc. v. Samshin, Ltd.*, No. 4:10-cv-4525, 2011 WL 1740212 (S.D. Tex. May 4, 2011), is also unpersuasive.   That case involved a post-*Hertz* determination of a corporate defendants's principal place of business.  *Id.* at *2.  As in this case, the plaintiffs argued that the corporation's identification of Houston as its principal place of business on a Texas state-tax form required remand.  The defendant disputed its statement on the tax form, attaching evidence that it maintained its "books, financial records, and remaining assets" in Oregon. The court concluded that remand was appropriate because "any contested issues of material fact or doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction."  *Id.* at *3.  *Petro Star* does not require remand in the present case.  The evidence AET submitted in this case goes directly to the issue identified in *Hertz*.  By affidavits and deposition testimony, AET has demonstrated that the CEO and CFO direct, control, and coordinate AET's business policies and activities from Kuala Lumpur.  The corporate defendant in *Petro Star* appears only to have provided evidence of where it kept "books, financial records, and remaining assets," not where important corporate decisions were made.  Second, the rule that ambiguities should be resolved against federal jurisdiction applies to statutory construction, not to resolving issues of facts. *See, e.g.*, *Manguno*, 276 F.3d at 723 (noting that "[a]ny ambiguities are construed against removal because *the removal statute* should be strictly construed in favor of remand," but stating that federal jurisdiction exists when the removing party shows complete diversity and that the amount in controversy exists "*by a preponderance of the evidence*" (emphasis added)); *see also In re Prempro Prods. Liab. Litig.*, 591 F.3d at 620; *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021 (9th Cir. 2007); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 747 F. Supp. 2d 704, 707 (E.D. La. 2010); *La. Specialty Hosp., LLC v. Adams*, Civ. A. No. 10-1513,

17

2010 WL 3211077, at *2 (E.D. La. Aug. 13, 2010); 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1350 & n.68 (3d ed. 2011) (noting that the court must "resolv[e] any issues of fact" regarding subject-matter jurisdiction and citing cases). The cases cited in *Petro Star* involve allegations of fraudulent joinder, which is not at issue here. *See* 2011 WL 1740212, at *2 (citing *Cantor v. Wachovia Mortg., FSB*, 641 F. Supp. 2d 602, 606 (N.D. Tex. 2009)).

The plaintiffs argue that AET relies improperly on the nerve center of the parent. The plaintiffs are correct that a corporate-subsidiary defendant seeking to prove diversity jurisdiction cannot rely on the location of its parent. *See J.A. Olson Co.*, 818 F.2d at 413–14. But this court's analysis has been confined to AET's officers. A subsidiary may share officers with its parent and have its principal place of business in the same location as its parent under *Hertz*. *See, e.g.*, *Harshaw v. Bethany Christian Servs.*, — F. Supp. 2d —, 2010 WL 1692833, at *24 (W.D. Mich. Apr. 26, 2010).

The plaintiffs argue that because AET "has not even pointed to 'a mail drop box [or] a bare office with a computer' that belongs to the entity AET Inc. Limited that exists outside of Texas, much less in Kuala Lumpur," its principal place of business must be in Texas. (Docket Entry No. 14, at 3 (quoting *Hertz*, 130 S. Ct. at 1195)). *Hertz* mentioned those examples as insufficient indicators of a corporation's nerve center when the record showed that it was elsewhere. *Hertz* does not require a bricks-and-mortar presence. To the contrary, the opinion makes clear the Supreme Court's awareness that nontraditional office arrangements are increasingly common. *See id.* at 1194 (noting the potential difficulties under the nerve-center test posed by the rise in telecommuting). *Hertz*'s clear emphasis is on where the corporation is actually controlled, not where buildings are

located, or where the bulk of the corporation's operations are located, or where corporate filings conclusorily state the primary office is located. *See id.* at 1193–95. The nerve-center test "points courts in a single direction, towards the center of overall direction, control, and coordination." *Id.* at 1194. Kuala Lumpur is where AET's CEO and CFO live and work, as the plaintiffs acknowledge, (Docket Entry No. 14, at 6), and, according to the evidence, where they direct, control, and coordinate AET's corporate policy and business activities. Under *Hertz*, Kuala Lumpur is AET's principal place of business. The motion to remand is therefore denied.

**IV.    Conclusion**

AET's principal place of business is in Kuala Lumpur, Malaysia. Complete diversity exists between the parties. The motion to remand is denied.

SIGNED on September 27, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

19